Larry Zerner (SBN 155473)
Morrison Cooper
10900 Wilshire, Suite 930
Los Angeles, California 90024
Telephone: (310) 773-3623
Email: Larry@MorrisonCooper.com

Attorney for Defendants Mitchell Clout
And Koil Content Creation Pty Ltd.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THAT ONE VIDEO ENTERTAINMENT, LLC, a California limited liability company,<br><br>                Plaintiff,<br><br>  v.<br><br>KOIL CONTENT CREATION PTY LTD., an Australian proprietary limited company doing business as NOPIXEL; MITCHELL CLOUT, an individual; and DOES 1-25, inclusive,<br><br>                Defendants. | Case No. 2:23-CV-02687 SVW (JCx)<br><br>DECLARATION OF LARRY ZERNER |

I, Larry Zerner declare as follows:

1.    I am an attorney admitted to practice before this Court and I am the attorney of record for Defendants in this action. The facts set forth in my declaration are known personally by me to be true and correct, and if called upon as a witness, I could and would competently testify thereto.

1

1  2. Attached hereto as Exhibit 1 is a true and correct copy of the employment
2 contract between TOVE and Danny Tracey. Nowhere in the document does it state that
3 Mr. Tracey is being hired to be loaned out to work at Koil.
4  3. Attached hereto as Exhibit 2 are true and correct copies of the relevant pages
5 from the deposition of Plaintiff's Expert William Francis.
6  4. Attached hereto as Exhibit 3 are true and correct copies of the relevant pages
7 from the deposition of TOVE's COO, Jacques Khalil.
8  I swear under penalty of perjury under the laws of the State of California that the
9 foregoing is true and correct.
10  Executed this 19th day of August in Los Angeles, CA.
11  /Larry Zerner/

# EXHIBIT 1



Dear Danny:

That One Video Entertainment, LLC (the "Company"), is pleased to offer you employment on the following terms:

1. **Position**. Your initial title will be Lead Developer and you will initially report to the Company's COO, Jacque Khalil. As the Company provides Entertainment Services, you may be required to appear on camera and create video tutorials and general media content around the Services you provide. This is a full-time, salaried exempt position. You will be required to work a minimum of 35 hours per week, and will not be eligible for overtime pay.

   During your employment with the Company, you will be required to devote substantially all of your working time and attention to the business of the Company and to performing your job duties as Lead Developer and/or any other position or responsibilities assigned to you. You agree to perform your duties in a diligent and professional manner. You will not, without the prior written consent of the Company's COO, engage in any other employment, consulting, or other business activity (whether full-time or part-time) that would (i) create a conflict of interest with the Company; (ii) compete with the Company's existing or reasonably anticipated business, products or services; or (iii) materially interfere with or impede the satisfactory performance of your duties and responsibilities for the Company. By signing this agreement, you represent and warrant that you have no contractual commitments or other legal obligations to any third party that would prohibit you from performing your duties for the Company.

2. **Salary**. The Company will pay you a starting salary in the gross amount of $105,000 per year. Your salary will be payable in periodic installments according to the Company's standard payroll schedule, and all payments will be subject to payroll deductions and withholdings required by law. Your salary may be subject to adjustment at the Company's discretion and pursuant to its employee compensation policies in effect from time to time.

3. **Sponsorships.** During your employment you may be eligible to participate in paid sponsorships for the services you provide to the Company. With respect to all such sponsorships, you agree that: (i) all compensation you earn is to be paid by the third party sponsor entity directly to the Company; (ii) the Company shall retain 30% of the gross amount paid for the sponsorships; and (iii) you shall be paid the remaining 70% of

4                                                                                                          TOVE000001

the gross amount paid for the sponsorships, subject to and less payroll deductions and withholdings required by law.

4. **Bonus.** During your employment with the Company, you may be eligible to receive an annual Bonus subject to your performance against certain goals, and other terms and conditions, to be determined by the Company.  Decisions concerning whether the Bonus will be paid in a given year, the amount of any such payment, and other terms and conditions of the Bonus, shall be made at the Company's sole discretion.  The Company shall pay any Bonus in one lump sum, subject to required payroll deductions and withholdings, at the end of the year to which it relates.  To be eligible for a Bonus, you must be actively employed by the Company at the time the Bonus is scheduled to be paid.

5. **Expenses**.  The Company will reimburse you for all reasonable and necessary expenses actually incurred by you in performing your duties in accordance with its policies and procedures.  Any expenses submitted by you for reimbursement by the Company must be supported with appropriate receipts, invoices, or other documentation verifying the nature, amount, and date of the expense.

6. **Confidentiality and Non-Disclosure Agreement**. Like all Company employees, you will be required, as a condition of your employment with the Company, to sign and fully comply with the Company's standard Confidentiality and Non-Disclosure Agreement, a copy of which is attached hereto as Exhibit A.

7. **Employee Handbook**. Like all Company employees, you will be required, as a condition of your employment with the Company, to read and sign an acknowledgment of receipt of the Company's Employee Handbook, a copy of which is attached hereto as Exhibit B.  You will be required to fully comply with all applicable policies and procedures set forth in the Handbook throughout your employment.

8. **Ownership Of Intellectual Property.**  During your employment with the Company, any creative or intellectual property developed and originated by you in performing your duties for the Company, will be Company property.  You will not, without an express written agreement signed by the Company's COO, have any rights to the property.

9. **Social Media**.  Your duties will involve developing content for social media, including written content, photos, and videos, related to the entertainment services provided by the Company.  In connection with these social media activities, you must always demonstrate professionalism, and exercise sound judgment and discretion.  In the event you post any content on social media, or engage in online behavior, that is determined by the Company to be: defamatory, discriminatory (based on race, national origin, sex,

religion, sexual orientation, or other classification protected by law), misogynistic, violent or threating violence, overtly prejudicial, pornographic or overtly sexual to the extent not suitable for a general audience, or otherwise inappropriate, you may be subject to disciplinary action, up to and including termination of your employment with the Company.

10. **At-Will Employment**.  Your employment with the Company is for no specific time period.  Rather, your employment is "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause.  Any contrary representations that may have been made to you are superseded by this letter agreement. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation, and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company (other than you).

11. **Verification of Identity and Employment Authorization.**  For the purpose of compliance with federal immigration law, you will be required to complete a Form I-9 and provide the Company with specified documentary evidence of your identity and eligibility to work in the United States.  You must complete this form and provide the required documentation within three (3) business days from your date of hire.  Your failure to comply with this requirement will result in the termination of your employment with the Company.

12. **Tax Matters.**

    a. **Withholding.** All forms of compensation referred to in this letter agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.

    b. **Tax Advice.** You are encouraged to obtain your own tax advice regarding your compensation from the Company. You agree that the Company does not have a duty to design its compensation policies in a manner that minimizes your tax liabilities, and you will not make any claim against the Company, or its Board of Directors related to tax liabilities arising from your compensation.

13. **Interpretation, Amendment and Enforcement.** This letter agreement and Exhibit A constitute the complete agreement between you and the Company, contain all the terms of your employment with the Company and supersede any prior agreements, representations, or understandings (whether written, oral, or implied) between you and the Company. This letter agreement may not be amended or modified, except by an express written agreement signed by both you and a duly authorized officer of the Company. The terms of this letter agreement and the resolution of any disputes as to the meaning, effect, performance, or validity of this letter agreement or arising out of, related to, or in any way connected with, this letter agreement, your employment with

the Company or any other relationship between you and the Company (the "Disputes") will be governed by California law, excluding laws relating to conflicts or choice of law. You and the Company submit to the exclusive personal jurisdiction of the federal and state courts located in the State of California in connection with any Dispute or any claim related to any Dispute.

We hope that you will accept our offer to join the Company. You may indicate your agreement with these terms and accept this offer by signing and dating this letter agreement and the enclosed Confidentiality and Non-Disclosure Agreement and returning them to HR. This offer, if not accepted, will expire at the close of business on October 31st, 2021. As required by law, your employment with the Company is contingent upon your providing legal proof of your identity and authorization to work in the United States. Your employment is also contingent upon your starting work with the Company on or before October 1st, 2021.

If you have any questions, please contact Jacque Khalil at jkhalil@thatonevideogamer.com or 310-466-4768

Very truly yours,

That One Video Entertainment, LLC

By: *[signature]*

Title: COO

I have read and accept this employment offer on the terms and conditions stated above:

*[signature: Tracey]*
_____

Danny Tracey

Dated: 10/14/2021

# EXHIBIT

```
 1                  UNITED STATES DISTRICT COURT
 2                 CENTRAL DISTRICT OF CALIFORNIA
 3    _____
 4    THAT ONE VIDEO ENTERTAINMENT,
 5    LLC, a California limited
 6    Liability company,
 7              Plaintiff,
 8         v.                                  Case No.
 9    KOIL CONTENT CREATION PTY LTD.,    2:23-CV-02687 SVW
10    An Australian proprietary                (JCx)
11    Limited company doing business
12    As NOPIXEL; MITCHELL CLOUT, an
13    Individual; and DOES 1-25,
14    Inclusive,
15              Defendants.
16    _____
17              VIDEOCONFERENCE DEPOSITION OF
18                     WILLIAM FRANCIS
19    DATE:           Monday, August 5, 2024
20    TIME:           2:33 p.m.
21    LOCATION:       Remote Proceeding
22                    Parker, TX 75002
23    OFFICIATED BY: Garrett Fitzgerald
24    JOB NO.:        6841925
25
                                                    Page 1
```

```
 1   checking on your own to make sure these numbers were
 2   correct?
 3              MR. BEGAKIS:  Objection, assumes facts
 4   not in evidence, vague.
 5        A    So I -- I did a little bit of spot checking.
 6   So I -- I -- in other words, I didn't -- you know, so --
 7   so first of all, I trust the software to do the math
 8   part of it better than me.  But I did do a little bit
 9   of -- of spot checking, meaning, like, I check out the
10   code at these different points in history and -- and at
11   least went and -- and sort of put them into Sublime like
12   we were talking about and looked to see, like, hey,
13   here's that -- you know, that function that was in the
14   original code basis is still here, you know -- you know,
15   three months later or whatever.
16        Q    Okay.  I'm going to move over to the addendum
17   part of the report.  In the addendum, you outline a
18   scenario where someone could access the NoPixel server
19   without agreeing to the terms and conditions; is that
20   correct?
21        A    It is.
22        Q    Okay.  And when you were coming up with this
23   scenario, were you using the current code or the code as
24   it existed in 2020?
25        A    I was 100 percent using the current code.
```

Page 41

1  Q   Okay.  Do you know if your answer would be
2  different if you used the code as it existed in 2020?
3  A   I don't know if it would be, but it certainly
4  could be.
5  Q   Okay.  Don't you think it's -- you understand
6  that Danny first joined NoPixel in 2020?  You understand
7  that; right?
8  A   Yes.
9  Q   So isn't it going to be important in order --
10 to have a scenario using the software as it existed in
11 2020?
12 A   Yeah, I think that -- I think that would
13 probably be more relevant, but I didn't really -- well,
14 first of all, I -- I no longer had access to -- to that
15 code at that point, and I really think that in the -- in
16 the streaming sort of gaming space, I -- I really think,
17 like, it -- it doesn't seem like -- you know, I can't
18 say whether, you know -- you know, Danny signed the
19 terms of service or not.  Right?
20      And I would -- you know, and I don't know
21 if -- if -- you know, if -- if -- you know, if Koil, you
22 know, saves that information, and if so can, you know,
23 hopefully reproduce it and, you know, clear up that
24 question altogether.  Right?  You know, I -- I was asked
25 if it's, you know, hypothetically possible.

Page 42

```
 1                CERTIFICATE OF DEPOSITION OFFICER
 2            I, GARRETT FITZGERALD, the officer before whom
 3     the foregoing proceedings were taken, do hereby certify
 4     that any witness(es) in the foregoing proceedings, prior
 5     to testifying, were duly sworn; that the proceedings
 6     were recorded by me and thereafter reduced to
 7     typewriting by a qualified transcriptionist; that said
 8     digital audio recording of said proceedings are a true
 9     and accurate record to the best of my knowledge, skills,
10     and ability; that I am neither counsel for, related to,
11     nor employed by any of the parties to the action in
12     which this was taken; and, further, that I am not a
13     relative or employee of any counsel or attorney employed
14     by the parties hereto, nor financially or otherwise
15     interested in the outcome of this action.
16
17                                     GARRETT FITZGERALD
18                               Notary Public in and for the
19                                       State of California
20
21     [X] Review of the transcript was requested.
22
23
24
25
```

Page 70

```
 1                    CERTIFICATE OF TRANSCRIBER
 2           I, NICHOLE RYAN, do hereby certify that this
 3   transcript was prepared from the digital audio recording
 4   of the foregoing proceeding, that said transcript is a
 5   true and accurate record of the proceedings to the best
 6   of my knowledge, skills, and ability; that I am neither
 7   counsel for, related to, nor employed by any of the
 8   parties to the action in which this was taken; and,
 9   further, that I am not a relative or employee of any
10   counsel or attorney employed by the parties hereto, nor
11   financially or otherwise interested in the outcome of
12   this action.
13
14
15                                            NICHOLE RYAN
16
17
18
19
20
21
22
23
24
25
                                                        Page 71
```

# EXHIBIT

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   THAT ONE VIDEO ENTERTAINMENT, LLC, )
     a California limited liability     )
 5   company,                           )
                                        )
 6                  Plaintiff,          )
                                        )
 7        vs.                           ) Case No.:
                                        ) 2:23-cv-02687 SVW
 8   KOIL CONTENT CREATION PTY LTD., an ) (JCx)
     Australian proprietary limited     )
 9   company doing business as NOPIXEL; )
     MITCHELL CLOUT, an individual; and )
10   DOES 1-25, inclusive,              )
                                        )
11                  Defendants.         )
     _____)
12
13
14
15               REMOTE DEPOSITION OF
16                    JACQUE KHALIL
17       PMK for THAT ONE VIDEO ENTERTAINMENT
18                 TORRANCE, CALIFORNIA
19                    JULY 12, 2024
20
21
22
23
24   REPORTED BY:  SANDRA S. PETRITSCH, CSR NO. 11684
25   FILE NO. 6799456

                                                  Page 1
```

```
 1   percentage of time that he was to be working on it.
 2        Q    Wasn't he required to stream enough that you
 3   could clear the $8,750.00 a month that you were paying
 4   him?
 5             MR. BEGAKIS:  Objection.  Assumes facts not in
 6   evidence.
 7             THE WITNESS:  I wouldn't call it a requirement.
 8   It was for both of our benefits that he streamed to earn
 9   the income and the donations so that he could -- not only
10   could we pay his salary, we could cover his salary and
11   operational cost, but that he could also make more money
12   on top of that.
13        Q    (By Mr. Zerner)  Why are you taking his
14   streaming money?  He's hired as lead developer.  That
15   streaming money is completely apart from developing.
16   Right?
17             MR. BEGAKIS:  Objection, vague.  Calls for a
18   legal conclusion.
19             THE WITNESS:  I disagree.  A lot of his
20   development was done while streaming, or a lot of
21   customization in some of his work was done during
22   streaming.
23        Q    (By Mr. Zerner)  You know a lot of streamers.
24   Right?
25        A    I do.
```

Page 32

```
 1   percent and with some of the others clients it was upwards
 2   of 20 percent.
 3        Q    Do you know what it was for Danny?
 4            MR. BEGAKIS:  Objection to the extent it calls
 5   for speculation.
 6            But if you know.
 7            MR. ZERNER:  Asking if he knows.
 8            THE WITNESS:  I believe it was 20 percent with
 9   Danny.
10        Q    (By Mr. Zerner)  So if Danny got $10,000 and he
11   gets the first $2,000 and then you get the rest, right,
12   and then you split it up afterwards?
13        A    So traditionally the way it works is the
14   management firm would collect the money from what are
15   generally like marketing or influencer agencies, so they
16   would collect the money.  They would take their fees and
17   any costs that they had on there.  So if they were
18   FedExing stuff or Ubering things, sometimes you have
19   products and stuff, so they'll take their cost out and
20   then that would be sent to T-O-V-E where we would then
21   take our percentage out and then hold the rest and send it
22   to Daniel at a later date.
23        Q    And when he got money -- so the employment
24   agreement says that TOVE is only entitled to 30 percent;
25   but when he got money, TOVE would actually take the first
```

Page 62

1  $8,750 or 100 percent of that money before they did the
2  70/30 split.  Correct?
3      A   I don't know if I would characterize it that
4  way.  You have to look at it from like an aggregate of all
5  the income that was coming in for the month.  The salary
6  was the base, plus I think there were some operational
7  overhead which Danny and I had agreed upon.  I think that
8  was like -- 12,500 was like the number he should be aiming
9  for as a bare minimum.  Anything over that was not only my
10 taking my 30 percent and covering cost, but it was extra
11 bonus money for him.
12         If there was a sponsorship deal -- like using
13 your example of 10,000 -- we would receive 8,000.  I would
14 take -- in accounting, we would account for the the 3,000
15 and then Danny would have the extra 5,000 as a bonusable
16 income.
17     Q   Right.  So if you only make 10,000 in a month
18 and it's a single month from streaming money; did TOVE
19 keep all of that?
20         MR. BEGAKIS:  Objection.  Incomplete
21 hypothetical and assumes facts not in evidence.
22         THE WITNESS:  I would also say that it never
23 happened -- yeah, it never happened.  Until the end of
24 2022; and I think we also, at some point, agreed at the
25 end of summer or maybe the beginning of the fourth quarter

Page 63

```
 1                    REPORTER'S CERTIFICATE
 2
 3
 4           I, SANDRA S. PETRITSCH, CSR No. 11684, Certified
 5     Shorthand Reporter, certify;
 6           That the foregoing proceedings were
 7     stenographically reported by me at the time and place
 8     therein set forth and were thereafter transcribed;
 9           That the foregoing is a true and correct
10     transcript of my shorthand notes so taken.
11           I further certify that I am not a relative or
12     employee of any attorney or any of the parties nor
13     financially interested in the action.
14           I declare under penalty of perjury under the
15     laws of California that the foregoing is true and correct.
16           Dated this 26th day of July, 2024.
17
18
19           [signature: Sandra S. Petritsch]
20
             SANDRA S. PETRITSCH, CSR No. 11684
21
22
23
24
25
```

Page 67